STATE OF MICHIGAN
COURT OF APPEALS

In re SMITH, Minors.

UNPUBLISHED
April 23, 2015

No. 322685
Wayne Circuit Court
Family Division
LC No. 07-472185-NA

Before: RONAYNE KRAUSE, P.J., and K. F. KELLY and SHAPIRO, JJ.

PER CURIAM.

This termination-of-parental-rights case is before us for the second time. Respondent-mother's rights were initially terminated in 2012. We reversed that determination and remanded for further proceedings in *In re Smith*, unpublished opinion per curiam of the Court of Appeals, issued December 6, 2012 (Docket No. 308819). Our directions for proceedings on remand were quite specific. They included the following: (a) "the trial court will retain jurisdiction over the children and engage in further efforts to reunify [respondent] with her children[,]" (b) "[t]he trial court should determine whether substance abuse or a medical condition causes [respondent]'s [episodic] disorientation, slurred speech, and other symptoms[,]" (c) "[i]f the trial court determines that drug screens are appropriate to monitor the *levels* of [respondent]'s prescription medication to determine whether she is abusing those medications, it shall order [respondent] to participate in drug screens and order sufficient analysis of those screens to determine whether [respondent]'s drug levels exceed her prescribed dosages[,]" and (d) "the trial court shall order the Department [of Human Services (DHS)] to engage in reasonable efforts to mitigate these conditions on [respondent]'s admitted problem: that her medications and conditions affect her ability to provide her children with proper care." *Id*. at 14.

The initial petition alleged that in May 2009, respondent passed out at home while caring for the children. *Id*. at 2. Emergency Medical Services personnel treated respondent "for an altered mental state with a brief loss of consciousness from an unknown cause." *Id*. Respondent acknowledged that she had taken alprazolam (brand name Xanax), but denied overdosing. *Id*. In July 2009, the DHS petitioned the court for protective custody of the children alleging that respondent was abusing Vicodin (hydrocodone), Xanax, and Tylenol 3 (acetaminophen with codeine additive). *Id*.

As discussed in our prior opinion, the plan recommended by DHS and adopted by the trial court was overwhelmingly focused on getting respondent to stop using these drugs despite the fact that they were being prescribed by her physicians for diagnosed conditions, including

-1-

epilepsy and a traumatic back injury. Respondent and her counsel repeatedly challenged this course of action, arguing that respondent had been duly prescribed the medications at issue and was not abusing them. Respondent maintained throughout the proceedings that her periods of reduced consciousness were due to petit mal epileptic seizures which were infrequent and that, with assistance and services, these episodes would not render her unable to provide the necessary care and custody of her children. Notably, no testing had been performed to determine whether the amounts of drugs detected was consistent with prescribed use as directed or, alternatively, with abuse. Her physicians were not contacted and no outside medical evaluation was sought.

As a result, we held that the DHS had not made reasonable attempts at reunification because the "efforts . . . did not address the problem that brought this case into the court's jurisdiction: that [respondent] passed out while caring for the children." *Id*. at 10. We also held that the trial court clearly erred in finding that statutory grounds for termination had been established because the DHS did not prove clearly and convincingly that respondent was abusing her prescription medication and because the DHS had not provided in services in regard to respondent's underlying medical conditions, there was no indication that respondent could not manage her condition in a manner sufficient to allow her to properly care for the children within a reasonable time. *Id*. at 13. On remand, the trial court again terminated respondent's parental rights under MCL 712A.19b(3)(c)(*i*) (conditions of adjudication continue to exist), (3)(g) (failure to provide proper care or custody), and(3)(j) (reasonable likelihood of harm if children are returned to parent).

This case now returns to us, and while we affirm the order of termination, we note that review of the case was unnecessarily complicated by a lack of compliance with our remand directions. There was no real effort to allow respondent to see her children; indeed, the DHS seemed to take pains to prevent respondent from having visitation. And, although our remand order was issued in December 2013, the DHS still made no contact with respondent's physicians to attempt to determine if she was abusing substances or whether her periodic disorientation was due to drug abuse or proper use of drugs for her epilepsy condition. No services appeared to be directed at preparing protocols to address respondent's occasional reduced consciousness.

Despite our continued criticism of the way in which the DHS handled this case, our review of the entire record leads us to affirm the termination. Respondent's compliance with the service plan was only partial and she appeared to derive little if any benefit from it. Ultimately, a real inquiry was conducted into respondent's drug use, the evidence of which demonstrated that her level of drug use was abusive and raised significant questions about whether she had been deceiving her physicians. When visitation was finally arranged, it clearly had a negative impact on the children. Moreover, service providers concluded that respondent was potentially dangerous and she expressed the intent to obtain a gun.

When we remanded the case, respondent had not been allowed to see the children in over a year. Given this period of time and the prior order of termination, at the first hearing after the remand, held January 10, 2013, the court indicated its view that the initial visitation occur in a supervised therapeutic setting. The DHS recommended that no visitation, even in a supervised therapeutic environment, be permitted until respondent was psychologically evaluated on the grounds that she had made "inappropriate" comments to the children at a previous visit. The court did not render a decision on visitation at that time.

At the next hearing, on January 24, 2013, respondent requested that the supervised therapeutic visits begin while the psychological evaluation was pending with the understanding that if respondent behaved inappropriately during the visit, it would stop immediately. The DHS opposed this option and took the position that no visitation should be permitted until respondent had completed a psychological evaluation, and, if recommended by the psychologist, a psychiatric evaluation as well. The court directed that the psychological evaluation "be done as soon as possible so that the visits can restart" and ordered respondent to identify her medical providers and prescriptions and sign any necessary releases for medical information. The court scheduled the next dispositional review and permanency planning hearing for March 7, 2013 and stated that the psychological evaluation should be done before that date.

At the March 7, 2013 hearing, the foster care worker testified that respondent had been scheduled for the psychological evaluation on February 8, 2013 but arrived 90 minutes late, resulting in it being rescheduled for February 27, 2013. The evaluation took place at that time; however, the psychologist's report had not been provided to the DHS by the March 7, 2013 hearing. As ordered by the court, respondent had provided a list of her medications and signed the necessary medical releases to allow the DHS to speak with her doctors. The foster care worker also reported that respondent was difficult to get hold of and that a worker from Family Care Network had an appointment with respondent at her home on March 1, 2013, but that respondent was not home at that time. She had also not been home for a scheduled appointment with a substance abuse counselor. The foster care worker advised the court that the DHS had not selected a setting for therapeutic visitation. Respondent was present at the hearing and agreed to participate in domestic violence counseling, as she had been the victim of such violence on one or two occasions in the past. The court directed that all services be continued and that respondent be re-referred for any services that had previously been discontinued.

The next dispositional review hearing was scheduled for May 13, 2013. However, the court noted that while respondent was present, she "appear[ed] to be under the influence of something today" and directed that she be drug tested before the hearing proceed. The drug test came back negative for all drugs other than opiates, and the court noted that "part of the issue in this case has been whether the opiates that have appeared in her drug screens are within an acceptable limit of the prescription medication she takes. That's the one thing we need to have." Given her condition, it adjourned the hearing to May 17, 2013.

At the time of that hearing, it had been six months since we had remanded the case and respondent had not yet been permitted to see the children. At the outset of the hearing, respondent's counsel moved to withdraw due to a breakdown in the attorney-client relationship (which respondent confirmed) and the court granted the motion. Respondent was represented by emergency house counsel for purposes of the hearing. At the hearing, a foster care worker testified that respondent was receiving parenting classes, substance abuse therapy, and had completed the psychological evaluation. The worker explained that the psychological report did not recommend a psychiatric evaluation but that the DHS felt one was necessary because respondent was taking Valium and had displayed mood swings in dealing with the DHS. He also testified that he believed a psychiatric evaluation was necessary to determine if plaintiff was suffering from a conversion disorder. He offered no reasons why visitation could not proceed while a psychiatric evaluation was pending but indicated that the DHS had not yet made any plans for a setting in which supervised therapeutic visitation could occur.

-3-

The court noted that respondent was testing at levels well above what it termed the "cut-off point" for opiates and other drugs. However, respondent's counsel indicated that this was not surprising given that she was prescribed those drugs and that the "cut-off point" was simply the threshold for detection on the test and that the DHS had still made no effort to have her drug levels reviewed to determine if they were consistent with the doses prescribed. The court then directed that plaintiff undergo a psychiatric evaluation and that the psychiatrist determine if she was taking the prescribed amount of drugs. The court found that respondent was not in compliance with the treatment plan, but it appears that the only basis for this conclusion was that a psychiatric evaluation had not been conducted.

The next hearing was held on June 25, 2013. At that time, respondent had received an early termination warning letter from parenting classes, had been terminated from domestic violence classes, and had missed two drug screens. The foster care worker testified that she had spoken with the children's therapist and that he could provide supervised visitation and family therapy. She also testified that the DHS had not yet made any arrangements for an expert to review respondent's drug levels to determine if they were consistent with prescribed dosages. On cross examination, the worker stated that he would "get the visits started as soon as possible" and that all that was needed was a referral for family therapy and a court order. The court found that respondent was not in compliance with the treatment plan and that the DHS had made reasonable efforts. The court directed that all services continue, that re-referrals be made for any terminated services, and that therapeutic visits begin as soon as possible. It also directed that a "medical review officer is to be appointed to monitor and review [respondent]'s drug levels."

The next hearing was held on September 19, 2013. The foster care worker testified that it had been determined by the DHS that the children's therapist should not be the individual that supervised visitation and that no other therapist had yet been selected. Similarly, the DHS had not yet assigned any medical expert to review respondent's drug levels. The DHS had difficulty maintaining contact with respondent because she had moved and was apparently homeless for a period until she obtained new housing. Her phone number had also changed. The attorney for the children requested that the permanency plan be changed to adoption but the court declined to do so, noting that the difficulty with services was due to fault on both sides and that respondent was making progress. Respondent's counsel requested that visitation begin immediately and that it be supervised by someone other than the present CASA worker due to difficulties in his relationship with respondent. The court found that respondent was not in compliance with the service plan and that reasonable efforts were being made. It directed continued services and dismissed CASA from the case, ordering that Parenting Partner be appointed. The court again directed that "a medical review officer is to be appointed immediately to monitor and review the [respondent]'s drug levels[,]" noting "[t]hat was the main issue in this case why it was reversed by the Michigan Court of Appeals [which] ordered me to order the Department to do that and so far it's not been done . . . . So that should be done as soon as possible." Supervised visitation finally began as part of family therapy in October 2013, a full ten months after our remand.

The next hearing took place on December 12, 2013, at which time a newly appointed attorney appeared for respondent, who was not herself present. The foster care worker and the

CASA worker testified.[1]  The foster care worker testified that respondent was continuing to participate in individual and substance abuse therapy and that the psychiatric evaluator recommended that respondent undergo an EEG and MRI in regards to her epilepsy diagnosis and participate in ongoing outpatient psychiatric services.  However, she also testified that respondent had been hostile to several participants in the case, had appeared to be in an impaired mental state at a family team meeting and a family therapy session, and had expressed an intention to obtain a gun permit.  In addition, there was an incident at family therapy in which the therapist physically touched respondent for purposes of showing empathy and respondent responded with a verbal threat.  Respondent had also missed many of the scheduled drug screens.  Those screens that had been conducted had generally shown negative results on all drugs other than those prescribed, but there were two tests that showed respondent was not taking the prescribed drugs and one test was positive for drugs that were no longer being prescribed.  The court was also advised that a medical review officer had finally reviewed the drug screens and found that they "did not show that she was overusing her prescription."  The worker also testified that since visitation with respondent had begun, each of the children's behavior, emotional state, and school performance had gone significantly downhill, although she agreed that the children wanted to see respondent.  The worker recommended that family therapy be suspended and that no other form of supervised visitation be instituted because respondent was argumentative and threatened the case workers.  She conceded, however, that none of respondent's angry behavior was directed at the children.  She also testified that respondent was not benefiting from services.

The court noted that respondent had missed six of 11 drug screens and that, while she had been compliant with some aspects of the service plan, "the huge 5000 pound elephant sitting in the room is the drug use  . . . and the fact that she's obviously having psychiatric issues that aren't being treated."  The court directed respondent to follow all recommendations, including referral to Community Mental Health (CMH), and suspended her participation in family therapy until she had been psychiatrically cleared.  It maintained the permanency plan as reunification.

The next hearing was held on February 18, 2014, but was adjourned due to a question concerning which attorney was representing respondent.  Respondent refused to sign the consent form for her son's scheduled surgery until she reviewed it with counsel.

The next hearing was held on March 5, 2014, by which time respondent had signed the consent form.  Yet another attorney was appointed to represent respondent and the hearing was adjourned until April 3, 2014.  During the intervening period, petitioner filed a supplemental petition seeking termination.  Counsel for respondent objected to authorization of the petition on the grounds that the DHS had never followed this Court's directive to determine whether her problems resulted from epilepsy and/or necessary medication, as opposed to drug abuse, and had never provided services to address her needs if the problem was not one of abuse.  She requested resumption of supervised visitation.  She also stated that respondent's neurologist had referred her to a psychiatric clinic, but, as they could not take on additional cases, had in turn referred

---

[1] It appears that although the referee had dismissed CASA from the case, there had been communication by CASA with the judge, who reinstated it.

respondent to another clinic where she had an appointment scheduled for early May. The court indicated that visitation could resume when respondent was cleared by a psychiatrist approved by CMH.

In March 2014, the foster care worker submitted a petition seeking termination of respondent's parental rights, again pursuant to MCL 712A.19b(3)(c)(*i*), (3)(g), and (3)(j). The petition alleged that respondent failed to comply with and/or benefit from her latest treatment plan. A hearing took place during May and June of 2014. Following the proofs, the court concluded that reasonable reunification efforts had been made, the statutory grounds were established by clear and convincing evidence, and termination of respondent's parental rights was in the children's best interests. The court entered another order terminating respondent's parental rights, and this appeal ensued.

In order to terminate parental rights, the trial court must find that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met by clear and convincing evidence. *In re McIntyre*, 192 Mich App 47, 50; 480 NW2d 293 (1991). Once the petitioner has established a statutory ground for termination by clear and convincing evidence, the trial court shall order termination of parental rights if the court also finds that termination of parental rights is in the best interests of the children. MCL 712A.19b(5). Whether termination of parental rights is in the best interests of the children must be proven by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We review both of these decisions for clear error. *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). A finding is clearly erroneous if, although there is evidence to support it, this Court is left with a definite and firm conviction that a mistake was made. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010).

Respondent asserts that termination was improper because the DHS failed to facilitate reunification. Generally, reasonable reunification efforts must be made to reunite the parent and child unless certain aggravating circumstances exist. *Mason*, 486 Mich at 152; *In re Frey*, 297 Mich App 242, 247; 824 NW2d 569 (2012); MCL 712A.19a(2). However, while the DHS has a responsibility to expend reasonable efforts to provide services to secure reunification, there exists a commensurate responsibility on the part of a respondent to participate in and benefit from the services offered. *Frey*, 297 Mich App at 248.

Respondent asserts there was an improper delay in starting services because no services were in place by the time of the March 2013 dispositional review hearing. However, the record shows that immediate efforts were made to get services started. The foster care worker engaged in efforts to locate respondent the day after the first hearing after remand (held slightly over one month after this Court's remand) and provided referrals for services shortly after she was located. But, respondent missed scheduled intake appointments and, on multiple occasions, had services discontinued by providers due to her failure to attend. This occurred even after the court directed that the discontinued services be restarted.

We agree with respondent that the delay in determining the nature of her drug use was wholly unjustified. However, respondent did little, if anything, to make the process easier and, to some degree, contributed to this delay. More to the point, at the termination hearing, the DHS submitted compelling evidence that respondent was abusing drugs and the trial court did not clearly err in finding that evidence clear and convincing. Respondent repeatedly testified that

she did not engage in drug-seeking behavior and did abuse her prescription medications. Respondent's assertion was supported by testimony from a psychiatrist, who examined her on only one occasion and stated that he did not conclude that respondent was engaging in drug-seeking behavior. However, his conclusions, based on his review of respondent's records from the Michigan Automated Prescription System (MAPS), were clearly inconsistent with those records. He opined that all of her prescriptions came from one doctor, her neurologist Dr. Barkley. However, respondent's MAPS record, which is part of the record before us, reveals that respondent was not only picking up medications prescribed by Barkley, but picking up duplicate prescriptions, often on the same dates, of Tylenol 3 and other drugs. This is plainly drug-seeking (and obtaining) behavior. There are also medical reports in the record that indicate that respondent presented to various medical providers demanding that certain prescriptions be refilled too early or claiming that her medications had been stolen. Respondent became confrontational when denied early refills.

Moreover, neither respondent nor her physicians ever offered a medical explanation for her continued use of large amounts of narcotic-based pain medications. There were references to an automobile accident that had taken place 18 years prior that resulted in a herniated disc. However, there was no evidence that respondent continued to undergo any other treatment for this injury, no medical records from which it could be concluded that copious amounts of pain medication were necessary as a last resort to an untreatable condition, nor even records that she continued to have pain or limitations as a result of that injury. Respondent did not offer testimony from her primary care physician and it appeared that the only other doctor she saw was the neurologist treating her seizure disorder, whom she saw two or three times per year. He testified that although opiates were not necessary to treating her epilepsy, he continued to prescribe significant quantities of pain medications for her back problems despite the fact that he did not seem to be treating her for that injury. He was also unaware that at the same time he was prescribing her with 184 tablets of Tylenol 3 per month, she was also being prescribed 60 tablets of Tylenol 4 per month by her primary doctor. The neurologist was also prescribing 124 tablets per month of carisoprodol (brand name Soma) and 90 tablets per month of clonazepam, a benzodiazepine. And at the same time, the primary care doctor was also prescribing 60 tablets per month of diazepam, another benzodiazepine. The neurologist also testified that the diagnosis of a seizure disorder had been made based on respondent's reports of such episodes, although none had been observed by medical staff and the appropriate testing was apparently never conducted.

Given that the record demonstrates that respondent engaged in drug-seeking behavior and drug abuse which, at minimum, contributed to the conditions that caused the court to exercise jurisdiction over the children, i.e., respondent passing out in their presence, we conclude that the trial court did not clearly err in finding that statutory grounds for the termination of her parental rights were proven by clear and convincing evidence. See MCL 712A.19b(3)(c)(*i*).[2]

---

[2] Having found that the trial court did not err in finding statutory grounds to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*), we need not address the additional statutory grounds. See *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011) ("Only one

The court also did not clearly err in finding that termination was in the children's best interests. In deciding a child's best interests, a court may consider the child's bond to his parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the suitability of alternative homes. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014); *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012). The trial court may also consider a child's well-being while in care. *White*, 303 Mich App at 714. The trial court should weigh all the evidence available to determine the child's best interests. *Id*. at 713.

Although there was evidence of bonds with respondent, the children were in a stable placement and doing well there. Two of the children were legally blind, all three were in therapy and required many services, and the foster care worker did not believe respondent would be able to advocate for them. The worker recommended termination because of the children's need for stability, the length of time the children had been in care, and respondent's failure to complete her treatment plan. The children expressed that they did not want to live with respondent and preferred to stay in their nonrelative foster care placement, where they had been since 2011. While the matter was first on appeal, these foster parents pursued adopting the children and were still interested in adoption during these subsequent proceedings. Given these circumstances, as well as respondent's unresolved issues, the trial court did not clearly err in concluding that termination of respondent's parental rights was in the children's best interests.

We agree with respondent that the failure to provide her with even supervised visitation for over ten months after remand, and the prompt suspension of that visitation, prejudiced respondent's ability to maintain and develop a bond with the children. The dangers that caused the children to come within the court's jurisdiction, i.e., those posed by respondent passing out while caring for the children and, later, her documented drug abuse, could have been adequately protected against in a supervised setting. Moreover, if respondent appeared at a supervised visitation visibly intoxicated, DHS workers could have canceled and rescheduled the visitation. Similarly, if respondent passed out, DHS workers would have been immediately available to properly care for the children. While there were allegations that respondent was mentally unstable and was sometimes confrontational with DHS workers, there was no evidence that she engaged in any physical violence toward DHS personnel and all agreed that she did not physically injure or threaten her children at any time. Nonetheless, for the reasons discussed, respondent is not entitled to relief.

Affirmed.

/s/ Amy Ronayne Krause
/s/ Kirsten Frank Kelly
/s/ Douglas B. Shapiro

---

statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds.").